## CHAMBERS ET ALS. *vs.* PERRY.

1. Personal property of a female ward in the possession of her guardian is not a chose in action, but property in the possession of the ward, and, on her marriage, vests, *eo instanti*, in the husband.

2. The fact, that personal property is held by a guardian, in common for several wards, does not reduce the interest of each to a chose in action, but as to each it is regarded as property in possession.

3. Whether the power of compelling the husband, who has married a ward of the court, to execute a settlement, would be exercised by the courts of chancery, as organised in this State, to the same extent as in England —QUERE?

4. In such case, the power of the court over the husband is exercised on the ground, that the marriage is a contempt, and before the husband can be relieved of it, the court will require him to make a proper settlement on the wife.

5. The mere circumstance, that the guardian of a female ward derives his authority from a court of chancery, cannot reduce to a chose in action the wards' interest in the property in his possession.

6. The rule, requiring a power to be exercised in strict conformity with the authority by which it is confered, does not apply to business of a public, or judicial nature. In such case, a power, entrusted to several, may be exercised by a majority.

Error to the Chancery Court of Perry. Tried before the Hon. Wilie W. Mason.

ORMOND and GRAHAM, for the plaintiffs in error:

1. The estate of the wards being undivided, and the decree of the chancellor being that the entire estate should remain in the hands of the guardian, undivided, and to be distributed as they came of age, or married, there was no such interest in the female ward as could vest in the husband by the marriage.— Until the distribution, it was a mere chose in action. This

case is fully within the principle of Bibb v. McKinley, 9 Port. 636, and is clearly distinguishable from Magee v. Toland, 8 Porter, 36, and McDaniel v. Whitman, 16 Ala. 343—see, also, 9 Ala. 413; Hood v. Archer, 2 N. & McCord, 149, and note; Bradford v. Goldsborough, 15 Ala. 311; Chilton v. Cabiness, 14 ib. 447.

2. The wife of Perry being a ward of the court of chancery, the possession of the guardian was that of a trustee, and the husband could not reduce her property, thus in the custody of the law, but by the order of the court, to enable the court to compel the husband if necessary to make a settlement on her.—15 Ala. 311; Connally v. Cavanaugh, 11 ib. 171.

3. The authority vested in the commissioners was a naked power without an interest, and could only be exercised in the mode prescribed by the grant. A majority, therefore, was not competent to act.—Clay's Dig. § 22; Lewin on Trusts, 266, margin 135.

4. In the case of a female ward of chancery, every application to the court must be in her name, as was also the terms of the decree of the chancellor; but here the application was by counsel, without notice to the guardian or the other wards, and the order made on the same day.—2 Ala. 11, Rule 9.

5. There was clearly no authority to execute the order of distribution, after the death of Mrs. Perry, for the reason, if no other, that it emanated at her instance and for her benefit.

6. The decree of the chancellor is, that the slaves be delivered to the husband. This is clearly erroneous. The property certainly did not vest until the approval by the chancellor of the distribution, which was in June 1848, after the law went into effect, securing to married women a separate estate in the property held before marriage, and if the wife died without children, (a fact which does not appear,) the husband would only be entitled to one half the estate.

7. The guardian could not have exercised the authority he did in this case, but in virtue of his appointment by the chancellor.—Alexander v. Alexander, 8 Ala. 803; Clay's Digest, 198, § 30.

GARROTT, for the defendant:

1. The main question presented by the record is settled in

the case of Magee v. Toland, 8 Port. 36. In this case, the case of The Ordinary v. Geiger & Wife, 2 Nott & McCord, 151, (precisely similar to the one at bar,) is cited and the principle therein decided is approved.—See, also, Davis v. Rham, 1 McCord's Ch. R. 195; Lanpey v. Gardner, 1 Hill, 191; Armstrong v. Simonton's Adm'r, 2 Taylor, 236; Banks' Adm'r v. Marksberry, 3 Littell, 275, and other cases cited in the opinion, in Magee v. Toland—see, also, McGee et ux. v. Ford, 5 Smedes & Marsh. 769; Loury v. Houston, 3 How. (Miss.) R. 394; U. S. Digest, vol. 2, 502, paragraph 182; Wade v. Boxley, &c. 5 Leigh, 442; Guerrant v. Hocker, 7 Leigh, 366—see, also, McDaniel v. Whitman, decided at the present term of this court; 16 Ala. 343; Whitaker v. Whitaker, 1 Dev. (N. C.) R. 310; Granbury v. Mhoon, 1 ib. 456; Pettijohn v. Beasley, 4 ib. 512, (directly in point); Pitts v. Curtis, 4 Ala. 350.

2. Three out of the five commissioners, (they being a majority,) were authorised to act.—Jennings & Graham v. The Adm'rs of Jenkins, 9 Ala. 285-288-9. This authority is believed to be conclusive.—See, also, Comm'rs of Alleghany Co. v. Lecky, 6 S. & R. 166, and Baltimore Turnpike, 5 Binney, 481.

DARGAN, C. J.—The facts of this case, so far as they are necessary to a proper understanding of the questions involved, may be thus stated: In December 1846, James B. Chambers was appointed by the Chancery Court of Perry county guardian of the persons and the estate of the four minor heirs of William J. McKerrell, deceased, whose names are Frances, William J., Thomas B., and Samuel McKerrell. At the time of the appointment of Chambers as guardian, an order was made by the chancellor, that he keep the estate, both real and personal, of all the minors together, and that distribution be made to each as they respectively should become of age, or to Frances at her marriage, should she marry before attaining her full age. It was further ordered, that upon the application of said minors as they became of age, or upon the application of Frances and her husband, should she marry before she became of age, the register should issue a commission to five discreet free-holders, who upon oath should allot and set apart to each heir or distributee, his or her share or proportion, and that they should make report of their proceedings and acts to said court. The order,

authorising the guardian to keep the property of his wards together without distribution, was made upon the petition of the guardian, alleging that it would be to their interest, owing to the nature and condition of their estate. Frances afterwards intermarried with Elijah B. Perry, and she and her husband made application in November 1847, to the register of the court, that her share might be allotted to her. Upon this application the register issued a commission to James L. Price, Robert W. Nicholson, Leonidas Walthall, Richard H. Jeffries and Edward A. Sample, directing them to allot and set apart to Frances Perry her share or proportion of the estate. This commission was issued on the first of December 1847, and was returned on the first day of January 1848, and from the return it appears that three only of the commissioners had acted, and they reported that they had allotted to Frances Perry five of the slaves, which belonged to the minors, to-wit, Bill, George, Louisa, William, and Julia. Upon the coming in of the report of the commissioners, Chambers, the guardian, and the other minors filed objections to it: First, that the application for a division was not in fact made by the said Frances, but by the solicitors of Elijah Perry alone; 2d, that the commission was not in fact issued until after the death of Frances Perry; 3d, that the commission was executed by three only of the commissioners.—These exceptions to the report of the commissioners were filed on the 25th of January 1848. At the June term 1848, they were overruled by the chancellor and the report confirmed, and the guardian was ordered to deliver the slaves, allotted to Frances, to her husband, Elijah Perry, on the first day of January then next following, and it was refered to the register to ascertain and report the value or hire of the slaves from the time the allotment was so made, until the time when the guardian was ordered to deliver the slaves to Perry, the husband of Frances. It was shown by the admission of the parties that Frances, the wife, died before the report of the commissioners was confirmed, but that she was alive at the time the application was made for the allotment of her share. The first and most important question that grows out of the foregoing state of facts is, what interest did Elijah Perry, the husband of Frances, take in her share of the property by virtue of the marriage? If her interest can be considered as property in possession, and not as a mere

47

chose in action, then it is clear, that the marriage operated as an absolute gift of it, and the husband may recover it in his own name by virtue of his title, acquired by the marriage, even after her death. But if her interest in legal contemplation is a mere chose in action, then the husband only acquired the right to reduce the chose in action into possession during the coverture. These rules are so common and familiar, that they need no authority to sustain them. Was then the interest of the wife property in possession, or was it a chose in action? In the case of Magee v. Toland, 8 Port. 36, the facts were, that the slave, which was the subject of controversy, belonged to a female, who was under age; she married with the plaintiff and shortly after died; at the time of the marriage, the slave was in the actual possession of the defendant, who had hired it from the guardian of the wife, and the time for which he had hired the slave had not expired, when the marriage was celebrated, nor when the wife died. This court held that the possession of the guardian was the possession of the wife, and that the hirer must be considered as the bailee of the guardian, and consequently the husband acquired a perfect title by his marriage. The authorities refered to by the court in that case, we think conclusive to show that it was correctly decided. Indeed, it would be difficult to perceive, how the possession by the guardian of the personal property of his ward could reduce the right of the ward to a chose in action. The possession of the guardian is the possession of his ward; it is through his right, and for his benefit, that the guardian acquires the possession, and this he holds for his ward's benefit. The ward therefore is not divested of possession, nor is his right turned into a mere chose in action.—See The Ordinary v. Geiger & Wife, 2 Nott & McCord, 151; Davis v. Rham, 1 McCord Chan. Rep. 195; Banks v. Marksberry, 3 Littell, 275.

But it has been argued, that as the interest of the wife was not separated from the interest of her minor brothers, that therefore her right was turned into a chose in action. To this argument we cannot assent. If one joint tenant, or tenant in common of a chattel, when there has been no conversion by the other, cannot be considered as an owner in possession, neither could the other; and the mere fact, that personal property was held in common by several, would reduce the right of all to a

chose in action. But the possession of one joint tenant, or tenant in common, is the possession of the other, and until there has been a conversion, or an ouster by one, both must be considered as in possession. This to us appears so self-evident, that it is scarcely necessary to cite authorities to prove it; but the precise question has been decided in the cases of Pettijohn v. Beasly, 4 Dev. Rep. 512, and in 2 Nott & McCord, 151. So it has been decided by this court, that the possession of a tenant for life is the possession of the remainder-man, and the marriage of a female, entitled to a slave after the determination of a life estate, transfered to her husband her title to the slave in remainder.—Curtis v. Pitts, 4 Ala. 350.

It is, however, again contended that because Frances, the deceased wife, was a ward of the court of chancery, and married without the knowledge or consent of the chancellor, that therefore the marital rights of the husband did not attach upon her property in the hands of her guardian, and that her subsequent death determined all the interest that he had in it. It is true that when an infant female is a ward of the court of chancery, the court will take care that she shall not marry without the consent of the court; and it is usual for a recognizance or bond to be required of the guardian, that the infant shall not marry without such leave, which, beyond doubt, would be forfeited, if the guardian sanctioned a marriage that had taken place, without the consent of the court.—2 Story's Eq. §§ 13, 59. But whether the guardian was consenting to the marriage or not, the court has the power to commit the husband, until he shall make a proper settlement upon his wife; nor will it make any difference, that the ward has arrived at full age and waives her right to a settlement, for the court will protect her against her own imprudent acts. In the case of Stevens v. Savage, Stevens married a Miss Jeffrey, a ward of the court, under the following circumstances : his addresses were favored by her father in his life-time, and after his death, he and the infant ward were married with the consent of all the family; yet the chancellor committed him for a contempt, and he was only discharged upon making a proper settlement upon his wife.—1 Vesey, 154. This authority of the chancellor over the husband, who may marry a ward of the court of chancery, without the sanction of the court, is fully sustained by the cases of Murch v. James, 4

Vesey, 386; Ball v. Couts, 1 V. & B. 300; Bathurst v. Murray, 8 Vesey, 74-78. Indeed, in the case last cited, the marriage having taken place without the knowledge of the guardian, and it being suggested that the father of the husband was implicated in bringing about the marriage, and that he was a man of property, the chancellor ordered that he should attend before him, saying that he would use the animadversion of the court, if he appeared to be a man of property, to compel him to make that provision, that might have been expected, upon a marriage properly conducted. Whether the courts of chancery, as organised in this State, would claim to exercise those powers to the same extent that the courts of England do, it is needless to inquire. Although it might be difficult to deny to them the existence of such powers, yet we cannot believe that the power of the court to compel a proper settlement to be made by the husband on the wife, when the marriage was celebrated without the leave of the court, can, in any aspect of the case, reduce the property of the wife in the possession of her guardian to a mere chose in action. This authority of the court over the husband is exercised on the ground that the marriage is a contempt of court, and before the husband is cleared of the contempt, the court will take care that he shall execute a proper settlement upon the wife. So in the case at bar, if the wife were living, we should be disinclined to permit the husband to receive the property from the hands of his wife's guardian, until he had made a settlement upon her, but she is dead, and the only question is, what interest did the husband take by marriage? Had the guardian derived his authority from the Orphans' Court, instead of the Court of Chancery, it is clear, that under the authority of Magee v. Toland, 8 Porter, the marriage would have vested the absolute title in the husband, because the property could be considered in no other light than as property in possession, and not merely as a chose in action; and we cannot believe, that because the authority of the guardian was derived from a court of chancery, this can alter the case or authorise us to consider the property in his possession as a chose in action merely. Without regard, therefore, to the form of those proceedings, we think the husband clearly entitled to the share or interest of his wife, and, she being dead without issue, it cannot be withheld from him.

It is again objected to the report of the commissioners, that but three of them executed it, though it was directed to five. But we consider this question settled by the case of Jennings & Graham v. The Adm'r of Jenkins, 9 Ala. 285. The court then said, "that in general there can be no doubt that a power must be exercised in strict conformity with the authority by which it is authorised to be executed, and that even unessential forms must be strictly pursued, if required to be observed in its execution," but that this rule did not apply to "business of a public or judicial nature. In such cases, a power entrusted to several may be executed by a majority." And in that case it was held, that the sale of land by two commissioners, under a commission from the Orphans' Court appointing three, was valid. Under this authority, we see no reason for refusing to confirm the report of the commissioners, as no objection is made that the division, made by them, was in any manner unfair or unjust. This view, we think, is conclusive of the case, and the decree of the chancellor must be affirmed.